IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

vs.                                    Case Nos.:  3:16cr6/MCR/EMT
                                                   3:18cv241/MCR/EMT

ANDRE DARRELL PERRY

---

## REPORT AND RECOMMENDATION

This matter is before the court upon Defendant's amended "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" (ECF No. 44).    The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.    *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).    The court reviewed the parties' submissions and held an evidentiary hearing, after which the parties filed supplemental briefs.    After a review of the record and the arguments presented, the undersigned recommends that the § 2255 motion be GRANTED, that Defendant's criminal judgment be re-entered, and that counsel be appointed to consult with him about pursuing an appeal.

## PROCEDURAL BACKGROUND

Defendant Andres Darrell Perry was charged on January 19, 2016, in a single-count indictment with possession of a firearm by a convicted felon (ECF No. 1).[1] Defendant pleaded guilty on November 15, 2016, before the undersigned (ECF No. 22–28, 47).    He was represented by CJA Attorney Stephen E. Sutherland.

The Presentence Investigation Report ("PSR") calculated that Defendant had a base offense level of 20 pursuant to § 2K2.1(a)(4)(A) because Defendant had a prior conviction for a crime of violence or a controlled substance offense (ECF No. 32, PSR ¶¶ 18, 44).    The predicate offense was Defendant's prior federal conviction for possession of an unregistered short-barrel shotgun.    After a three-level downward adjustment for acceptance of responsibility, his total offense level was 17.    With a criminal history category of VI, the applicable advisory guidelines range was 51 to 63 months (ECF No. 32, PSR ¶¶ 39–48, 94).

Defendant objected to the application of the § 2K2.1(a)(4)(A) enhancement, arguing that the possession of a sawed-off shotgun was not a "crime of violence" after *Johnson v. United States*, 135 S. Ct. 2551 (2015) (ECF No. 32, PSR ¶ 117).

---

[1] Defendant previously served a 28-month federal sentence for possession of a firearm by a convicted felon and possession of an unregistered short-barrel shotgun (*see* ECF No. 32, PSR ¶ 44; *see also* Case No. 3:08cr115/MCR).

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

Without the enhancement, his base offense level would have been 14 and the total offense level would have been 12, yielding an advisory guidelines range of 30 to 37 months (ECF No. 32, PSR ¶ 118).

The court overruled the objection based on then-binding precedent and sentenced Defendant at the top of the applicable guidelines range based on his repetitive criminal conduct (ECF No. 45 at 2–3, 13–14).   The court declined the Government's request to state what the sentence might have been had there been a different ruling on the predicate "crime of violence" issue (ECF No. 45 at 17–18). In declining to do so, the court noted that the law was in a "state of flux" and that it was not prepared to make the decision at that time.   Before adjourning the proceedings, the court advised Defendant that an appeal had to be filed within fourteen days of the date of the judgment.

Defendant did not appeal, and it is this lack of appeal that forms the basis of the instant § 2255 motion.   Defendant's lone claim for relief is that Mr. Sutherland failed to appeal the application of the U.S.S.G. § 2K2.1 enhancement in his case, after preserving the objection.   The Government opposes the motion.

# ANALYSIS

## General Standard of Review

A defendant who contends that counsel's performance was constitutionally deficient must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).   A claim involving an alleged failure to file an appeal is analyzed slightly differently.   Prevailing law provides that a lawyer who disregards a client's specific instructions to file a notice of appeal acts in a manner that is professionally unreasonable.   *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (citing *Rodriguez v. United States*, 395 U.S. 327 (1969); *Peguero v. United States*, 526 U.S. 23, 28 (1999)).   This is because a defendant whose lawyer fails to file an appeal upon request has been denied an entire judicial proceeding; therefore, prejudice is presumed without regard to the merits of the putative appeal, and the defendant is entitled to pursue a belated appeal.   *Id.*; *Gomez-Diaz v. United States*, 433 F.3d 788, 792 (11th Cir. 2005).

However, in cases where a defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, the question whether counsel has performed deficiently by not filing a notice of appeal is analyzed as follows:

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

> [T]he question . . . is best answered by first asking a separate, but
> antecedent, question: whether counsel in fact consulted with the
> defendant about an appeal.   We employ the term "consult" to convey
> a specific meaning — advising the defendant about the advantages and
> disadvantages of taking an appeal, and making a reasonable effort to
> discover the defendant's wishes.   If counsel has consulted with the
> defendant, the question of deficient performance is easily answered;
> counsel performs in a professionally unreasonable manner only by
> failing to follow the defendant's express instructions with respect to an
> appeal.   *See supra* 1034–1035.   If counsel has not consulted with the
> defendant, the court must in turn ask a second, and subsidiary, question:
> whether counsel's failure to consult with the defendant itself constitutes
> deficient performance.

*Flores-Ortega,* 528 U.S. at 478; *see also Thompson v. United States*, 504 F.3d 1203,

1207 (11th Cir. 2007).   The *Flores-Ortega* Court rejected a bright-line rule that

counsel must always consult with a defendant regarding an appeal:

> We instead hold that counsel has a constitutionally-imposed duty to
> consult with the defendant about an appeal when there is reason to think
> either (1) that a rational defendant would want to appeal (for example,
> because there are nonfrivolous grounds for appeal), or (2) that this
> particular defendant reasonably demonstrated to counsel that he was
> interested in appealing.   In making this determination, courts must
> take into account all the information counsel knew or should have
> known . . . .   Although not determinative, a highly relevant factor in
> this inquiry will be whether the conviction follows a trial or a guilty
> plea, both because a guilty plea reduces the scope of potentially
> appealable issues and because such a plea may indicate that the
> defendant seeks an end to judicial proceedings.

*Id.,* 528 U.S. at 480; *see also Devine v. United States*, 520 F.3d 1286 (11th Cir. 2008) (finding counsel had no affirmative duty to consult with defendant about an appeal where defendant was sentenced at the bottom of the Sentencing Guidelines range after pleading guilty and waiving right to appeal); *Thompson,* 504 F.3d at 1208 (11th Cir. 2007) (defendant dissatisfied with perceived disparate sentence met burden of showing he would have wanted to appeal); *Otero v. United States*, 499 F.3d 1267 (11th Cir. 2007) (defendant who received sentence at low end of predicted guidelines range and had not expressed desire to appeal failed to show prejudice).

In cases where a defendant has not specifically instructed his counsel to file a notice of appeal, a *per se* prejudice rule does not apply, rather, a defendant must demonstrate a reasonable probability exists that, but for counsel's allegedly deficient performance, he would have timely appealed.    *Flores-Ortega*, 528 U.S. at 484, 486; *Thompson,* 504 F.3d at 1207.    In such a situation, either "[e]vidence that there were nonfrivolous grounds for appeal or that the defendant in question promptly expressed a desire to appeal will often be highly relevant in making this determination."    *Flores-Ortega*, 528 U.S. at 485.    "Because a direct appeal of a federal conviction is a matter of right, *see Rodriquez v. United States*, 395 U.S. 327, 329–30 (1969), we determine whether a defendant has shown that there is a

reasonable probability that he would have appealed without regard to the putative merits of such an appeal." *Thompson*, 504 F.3d at 1208 (citing *Flores-Ortega*, 528 U.S. at 485–86; *Gomez-Diaz*, 433 F.3d at 793). Such claims are highly fact dependent and often require evidentiary hearings to fully a develop a record upon which the court can make a proper credibility determination.

<u>Defendant's Ineffective Assistance of Counsel Claim</u>

Defendant claims that Attorney Stephen Sutherland rendered constitutionally ineffective assistance because he did not file an appeal as requested. He asserts in his motion that immediately after sentencing he requested that counsel file an appeal (ECF No. 44-1 at 2). He states his attorney visited him within a week after February 2, 2017, sentencing at the Santa Rosa County Jail to discuss an appeal. He claims the two men agreed not to appeal the *conviction* in light of Defendant's guilty plea, but to appeal the U.S.S.G. § 2K2.1(a)(4)(A) sentencing enhancement (*id.*), without which Defendant's base offense level would have been 14 instead of 20. Defendant notes he mailed counsel a letter between April 5 and April 12, 2017, inquiring about the appeal and advising counsel that he would be serving his sentence at FCI Marianna (*id.*). He waited to hear from counsel, to no avail. Defendant states he learned that no appeal had been filed in November of 2017, after

his uncle went to the court house to make a payment for Defendant and found out that Defendant's case was closed (*id*.).    Defendant also submitted an affidavit reiterating his discussions with counsel and his desire to pursue an appeal (ECF No. 53).

## The Evidentiary Hearing

At the evidentiary hearing, Defendant testified about the evolution of the objection to the § 2K2.1(a)(4)(A) enhancement and his discussions with counsel (ECF No. 65 at 9–10).    Defendant testified that he and Mr. Sutherland had talked about a case similar to his that was pending in the Supreme Court, and that depending on the Court's ruling, Defendant's case could "piggyback" off that case (*id*. at 11). Defendant understood this to mean that his case would "piggyback" off the other case in the appellate court, and he believed that counsel intended to appeal.

Continuing, Defendant testified that Mr. Sutherland met with him at the jail within a week after sentencing.[2]    The two men discussed the possibility that if Defendant appealed, the Government might also appeal the judge's decision about an "upward variance" (ECF No. 65 at 11).    Defendant stated he understood that if

---

[2] Based on other evidence in the record, this meeting likely occurred on February 5, 2017 (*see* Evidentiary Hearing Government's Exh., Tab 13), or three days after the sentencing hearing.

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

he appealed, the Government might try to "get [him] a higher sentence than the sentence [he] got," in other words, that by pursuing an appeal he risked getting the "max" of ten years instead of the 63 months he received (*id.* at 11–12). This information did not dissuade Defendant from his desire to appeal, and he told counsel "I'm going to take my shot" or "I'll take my shot," meaning that he wanted to "take [his] chance at [the Government] filing their appeal and [him] winning [his] appeal" (ECF No. 65 at 12–13, 48, 50). Defendant stated he was not concerned about a separate issue, his sentencing credit, because of a prior experience. Defendant explained that when an issue about sentencing credit came up in his earlier federal case he resolved it directly through the BOP, and he was familiar with the administrative remedy procedures (*id.* at 14). According to Defendant, he and Mr. Sutherland did not discuss this issue at their first post-sentencing meeting. Defendant did not recall counsel giving him the court's sentencing minutes or anything else at that first meeting (*id.* at 33).

Defendant also did not remember Mr. Sutherland telling Defendant at the February 5, 2017, meeting to let counsel know if he wanted to appeal. Rather, after this meeting with Mr. Sutherland, Defendant understood that counsel was filing the appeal (ECF No. 65 at 15). Defendant never sent Mr. Sutherland a letter telling

counsel that he wanted to appeal because he did not think he had to, because he had advised counsel in person that he wanted to take his shot (ECF No. 65 at 15–16, 50). Later, Defendant sent Mr. Sutherland a letter telling counsel where he was being sent by the BOP, in which he also "asked the status," presumably of the appeal he believed was pending (ECF No. 65 at 15).[3]

Counsel and Defendant met a second time at the Santa Rosa County Jail on March 6, 2017, before Defendant was moved to the BOP. During this meeting they did not discuss an appeal because, in Defendant's words, "it should have been in" (ECF No. 65 at 16).

Post-conviction counsel published clips of phone calls between Defendant and various friends or relatives that had been recorded at the Santa Rosa County Jail. Each clip seems to contemporaneously corroborate Defendant's belief that an appeal was pending. For instance, on February 7, 2017, after Defendant's first post-sentencing meeting with counsel, the following exchange took place during a phone call between Defendant and his grandmother, Vester Pate:

---

[3] A letter matching this description is not in evidence. The only letter is one noted as received by counsel on February 15, 2017, which mentions neither Defendant's BOP designation, nor his appeal (Evidentiary Hearing Government's Exh., Tab 8 at 4).

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

Defendant:    That paperwork is real important, though.    It's my — it's the stuff I got to file on my appeal.

Grandmother:    That you're going to file on your appeal when? When you get out of prison?

Defendant:    No. When I get down the road.    I've got to finish this county — this county sentence, and then I — then I — then I'll leave to go to prison.    My release date from over here is next month on the 26th.    They already — they already — my appeal – my appeal already in the courts, so it's just — I got to — I got to — it's — it's citing certain cases on my argument.    I got — I got my oral argument — I sent my oral argument up and my plea deal up.    They sentenced me to 63 months, but I was supposed to have been sentenced 30 to — within the guidelines of 30 to 37.    So I'm going to appeal it, and I should be back — I should be back in court within a year to get resentenced.

Grandmother:    Yeah.

. . .

Defendant:    Then I'm going to go to prison, but I got an appeal in, and I should be back in court to get resentenced within a year if they grant my appeal.    But, you know, they gave me — they gave me 63 months. So, as of right now, I got four years left that I ain't – they ain't give me credit for all the time I've been in jail.    They only gave me credit for a year.    But if I win my appeal, then I'll get out this year.    You heard me?

(ECF No. 65 at 18–19)

A little over a week later, on February 15, 2017, the following exchanges took place between Defendant and an unidentified person during a single call:

Defendant:    Gave me 63 months.

Unidentified person.    They gave you five years?

Defendant:    Yeah, five years, three months.    But I got an appeal in – I got an appeal in.    I'm appealing my sentence.    They over-sentenced me by 27 months.    I got, uh — I got, uh — I'm waiting on the Supreme Court to rule on *Hall v. United States*.    But I got a — I got a — I sent

— I sent some paperwork around to grandma's house, and she put it up
for me.    But I want to — I'm going to try to make sure that — that—
that, when I get down the road, I can get you to put it together and mail
it to me because I'm doing the appeal myself.
Unidentified Person:    Uh-huh.
. . .
Defendant:    . . . three months.    I got an appeal in —
Unidentified Person:    — (inaudible) —
Defendant:    That's five years, three months.    I got an appeal pending
but, you know, I've been locked up two years or damn near two years.
With gain time, I've got two years in.    So I'm going to come home
like the end of next year.    I'm going to be back in the county — I'm
going to be back in the county probably in about eight months, eight
months to a year on my appeal.

(ECF No. 65 at 19–20.)

On March 25, 2017, Defendant told an unidentified person "I got an appeal in

the courts right now.    I should be back within this year.    Within — within —

within a couple of months I should be back on my appeal.    But if not, I'll get out

next year." (ECF No. 65 at 21).    Finally, on April 4, 2017, Defendant told another

unidentified man that he had "about three more years, man, unless my — unless this

appeal goes through" (*id.*).

When asked to explain why he told his friends and family that he had an

appeal in court, Defendant explained simply "[b]ecause I thought the notice of

appeal was filed [by Mr. Sutherland]" (ECF No. 65 at 22).    Defendant also noted

that it was he who brought to counsel's attention that his case was "identical to the

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

*Johnson* case, the sawed-off shotgun isn't a crime of violence" (*id.*).    To explain

his statement to his friend that he was going to work on his appeal, he said "no one

is going to work like me for my freedom," although Defendant acknowledged that

he did not mean that he would actually do it alone, but would provide assistance to

the attorney who would conduct the appeal (*id.* at 23), presumably as he had with

respect to the objections to the PSR.

Once Defendant learned that there was no appeal pending he started "trying

to figure out how to do the 2255" (*id.* at 25).    He filed his initial motion to vacate

in early February of 2018, approximately three months after his uncle informed him

that no appeal was pending.

On cross-examination, Defendant stated that he learned of the *Johnson* case

and its possible implications for his case from federal inmates in the dorm at the

Santa Rosa County Jail (ECF No. 65 at 27–28).    His recollection of whether he had

directly asked counsel to file an appeal at sentencing was unclear.    Defendant

believed that counsel would file an appeal because of conversations that the two men

had before sentencing about preserving the issue of the enhancement, and he thought

if an issue was preserved for appeal "it was in," but he was unable to say that he

directly told counsel to "file an appeal" or words to that effect (*id.* at 31–33).

Defendant, however, recalled the conversation with counsel during counsel's first post-sentencing visit to the jail (*id*. at 33–34).    Counsel advised him that the Government could appeal his sentence and he could get the statutory maximum sentence instead of one within the applicable guidelines range.    Mr. Sutherland did not offer any advice on the jail credit issue and with respect to the *Johnson* question, counsel advised that they were waiting for a case to be decided.    Defendant did not recall Mr. Sutherland requesting that Defendant advise him or the clerk of court in writing if he wanted to appeal (*id*. at 37, 49), and he unequivocally stated that he would have done so had counsel made this request because he wanted to follow through with the appeal (*id*. at 45).

Defendant did not waver from his position that, based on his understanding of the case law, any gamble in taking an appeal was worth the risk.    For instance, if he lost the "double credit" on his VOP and his federal case, he said it would have been seven to eight months, versus the potential 24 to 27-month difference in his sentence if he won (ECF No. 65 at 44).

Defendant admitted to suffering from bipolar disorder but stated that it did not prevent him from understanding the truth and a lie; he also stated it was not affecting him as he sat in court that day (ECF No. 65 at 41, 42).

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

The only other witness to testify at the hearing was Stephen Sutherland, Esq., an experienced criminal attorney who has handled hundreds of felony cases throughout his career (ECF No. 65 at 52–53). No court has ever found that he failed to file an appeal as instructed, that he had not consulted with a criminal defendant about an appeal, or that he had rendered constitutionally ineffective assistance (ECF No. 65 at 53). Mr. Sutherland described Defendant as a very cooperative client who understood what was going on and corresponded regularly to share his ideas and research (*id.* at 54–55). Defendant helped counsel develop the objection to the use of the prior conviction of possession of a sawed-off shotgun as a crime of violence (*id.* at 55–56; Evidentiary Hearing Government's Exh., Tab 4 (henceforth "EH Gov. Exh.")). Counsel thought the objection would be successful until the Eleventh Circuit rendered its decision in *Matchett*.[4] Nonetheless the defense did not withdraw the objection.

Mr. Sutherland also argued for prior custody credit for his client because Defendant had spent time in state custody before his federal arrest (ECF No. 65 at 57). Counsel was unaware at the time that Defendant had a probation violation

---

[4] *United States v. Matchett*, 802 F. 3d 1185 (11th Cir. 2015) (holding that the vagueness doctrine of the Due Process Clause did not apply to the advisory Sentencing Guidelines).

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

sentence, although he conceded that he "should have" known (*id.*).    Counsel characterized AUSA Tiffany Eggers as being "very upset" when he made this argument, because she felt that "she had been blindsided" and "she hadn't had enough time to look into the issue" (*id.* at 58).    After sentencing, counsel asked if Ms. Eggers was going to appeal the court's award of sentencing credit, and she said she did not know.    Mr. Sutherland was left with the impression that if he appealed, the Government would also appeal (*id.*).

Mr. Sutherland denied that Defendant had ever asked him to file an appeal or any words to that effect (ECF No. 65 at 59), although neither attorney specifically asked counsel about the words used by Defendant during his testimony (i.e., that he wanted to "give it a shot" or "take a shot").    Counsel testified he went out to the jail and talked to Defendant about an appeal before the judgment was entered.    He stated his client understood that appealing the conviction was not at issue. However, there was a question of "whether [he and Defendant] were going to appeal that shotgun issue and what the repercussions of that would be" (*id.*).    Counsel did not recall whether the two men discussed, prior to sentencing, whether there would be an appeal.    He believed that they probably would appeal the issue because they

had "nothing to lose" since the Supreme Court had not yet decided *Beckles v. United States*, 137 S. Ct. 886 (2017).

Counsel's view about there being "nothing to lose" changed when the district court awarded Defendant credit for time served from the date of the federal indictment, instead of the date of federal arrest.   Counsel believed that the Government would likely cross-appeal the credit issue, successfully, and that Defendant risked losing almost a year of credit in exchange for only a small possibility of gaining 24 months of credit (ECF No. 65 at 60).

Directly after sentencing Mr. Sutherland had only a brief conversation with his client, and he told Defendant that he would come to the jail to talk to him (ECF No. 65 at 61).   Counsel went to the jail after he obtained a copy of the sentencing minutes, which was before judgment was entered.   Counsel identified a copy of the sentencing minutes with his handwritten notation on them (EH Gov. Exh., Tab 13). The note reads: "Provided copy to D 2-5-17; D probably will not Appeal" (*id*.).   Mr. Sutherland recalled that most of the long conversation on that day focused on whether to appeal the shotgun enhancement and risk the Government appealing the award of sentencing credit.   In counsel's opinion, the Government had a very good chance of winning on its issue, while the defense chances were not good.   Mr.

Sutherland and Defendant "sat down and talked about the pros and cons" of appealing (ECF No. 65 at 63).    Counsel knew that "the decision had not been made whether or not to appeal" but he felt that after Defendant considered the situation "that he was not going to appeal — or did not want [counsel] to file an appeal" (*id.*). Mr. Sutherland admitted though that "[Defendant] never said that" (*id.*)    Counsel acknowledged that his handwritten notation on the sentencing minutes stating that "D probably will not appeal" was based on his assessment rather than a definitive statement from his client.

Mr. Sutherland told Defendant during the February 5, 2017, meeting that the judgment had not been entered and that an appeal would have to wait until "after the judgment came" (ECF No. 65 at 64).    He asked Defendant to let him know where he was "shipped out to" so counsel could provide Defendant a copy of the judgment (*id.*)    In apparent response to this request, Defendant sent counsel a brief letter asking counsel to send a copy of the judgment to him at the Santa Rosa County Jail, where he would be until late March or early April (EH Gov. Exh., Tab 8 at 3).    The letter, as noted previously, did not mention the appeal.    Counsel responded on February 15, the date he received Defendant's letter, by advising Defendant that he had not received a copy of the judgment, but he did have a copy of the minutes of

the proceedings, which explained that Defendant had received approximately 13 months of credit for time served (EH Gov. Exh., Tab 8 at 4).    Counsel's letter and explanation is ten days after he purportedly delivered a copy of the sentencing minutes to Defendant (EH Gov. Exh., Tab 13).    Mr. Sutherland did not offer a reason or explanation, when asked, for why he repeated the same information about the sentencing minutes that he had purportedly already provided to his client in person (ECF No. 65 at 78–79).

Mr. Sutherland testified that he forwarded Defendant a copy of the judgment approximately one week later, which would have been on or about February 22, 2017, although a copy of any accompanying correspondence was not entered into evidence (ECF No. 65 at 66).    Counsel did not receive any further correspondence from Defendant, but he went to see him at the Santa Rosa County Jail on about March 6, 2017, while he was there visiting another client.    Mr. Sutherland described this as a "courtesy visit" during which he and Defendant discussed things such as where Defendant might be housed within the BOP.    Counsel stated "I gave him — we went over the judgment so he understood about how they calculated the credit he got for time served" (*id.*).    Despite his previous uncertainty about Defendant's wishes with respect to an appeal, counsel did not recall saying anything

to Defendant about an appeal at that time.    He also said that he knew that Defendant did not say anything about this issue, because had that happened, counsel would have made a note of it (*id*. at 66, 79–80).

Mr. Sutherland did not recall any issue about the Government seeking an upward variance from the applicable guidelines sentence (ECF No. 65 at 67).    He reiterated that his only concern with respect to an appeal was whether Defendant would be able to retain the credit for time served that the district judge awarded.

Mr. Sutherland received, from AUSA Tiffany Eggers, a copy of a letter she received from the Bureau of Prisons about Defendant's sentencing (EH Gov. Exh., Tab 11).    The letter indicated that some of the credit awarded by the court was not authorized by statute and sought Ms. Eggers' input as to how to handle it.    Mr. Sutherland described his receipt of the letter as Ms. Eggers telling him "I was right" or "I told you so," but noted that Ms. Eggers apparently did not pursue the matter further (ECF No. 65 at 68, 71).    Although counsel did not have the benefit of the letter at the time he was discussing Defendant's situation with him, counsel "knew what the statute said" (ECF No. 65 at 71).

Counsel did not recall arguing that Defendant should get credit all the way back to September of 2015, when he was first arrested, rather than just from the date

of the January 2016 indictment through his September 2016 federal arrest (ECF No.
65 at 74).

Mr. Sutherland reiterated that Defendant did not tell him one way or another
at the February 5 meeting what his decision was with respect to an appeal.
Nonetheless, having not expressed a specific opinion on the issue of an appeal, he
"got the idea" from Defendant that Defendant would not appeal and run the risk of
losing some time (ECF No. 65 at 78).

The court asked several follow up questions.   In pertinent part, it queried
whether it was safe to say that as of February 5th, at least in counsel's mind, there
had been no definitive decision made regarding Defendant's appeal (*see* ECF No.
65 at 80).   Mr. Sutherland responded somewhat equivocally by stating, "That's
most likely," and went on to say:

> But I always advise my clients, Judge, to send me a letter in writing that
> they want an appeal and to send a copy of that letter to the Court that
> they want an appeal, and I always said the reason why is if I walked out
> and get run over by a bus, if you send a letter to the Court that you want
> to appeal, it's preserved

(ECF No. 65 at 80–81).   Thus, counsel stated he placed the onus on his client to let
counsel know if he wanted to appeal (*id*. at 81).   Although counsel did not have a
specific recollection of telling Defendant to send him a letter, he is fairly certain he

did because this is what he tells all his clients (*id*. at 82).    Counsel never received

any correspondence from Defendant advising that he wished to appeal, and no other

third party attempted to communicate this information to counsel (ECF No. 65 at

84).

Discussion

This case presents an unusual situation where both witnesses appeared

credible with only minor internal inconsistencies in their testimony.    Although

Defendant was sometimes confused about factual details, he had a better than

average understanding of the sentencing options in his case and the difference

between a guidelines sentence and the statutory maximum (*see e.g.,* ECF No. 65 at

44).    He also appeared to have rationally calculated the risk of an appeal versus the

potential gain he expected based on his understanding of the case law.    Mr.

Sutherland is a seasoned criminal defense attorney who is well-versed in the facts

and law of his client's case.    As such, a point by point consideration of the parties'

post-hearing briefs is instructive.

In the post-hearing brief, Defendant argues that his claim that he requested

trial counsel file an appeal is supported by his own credible testimony as well as

contemporaneous evidence, including the phone calls he made from the jail.

Because Defendant believed that counsel was going to file a notice of appeal after the February meeting at the jail, he did not believe further follow-up was needed at the March "courtesy visit." The phone calls Defendant made to family members corroborate his position. As the defense notes, it would be illogical for Defendant to have told multiple people that an appeal was pending if he had recently told counsel he did not want to appeal.

Alternatively, Defendant argues that counsel was constitutionally ineffective because he failed to consult with him and ascertain his wishes. The record is uncontroverted that counsel discussed the advantages and disadvantages of filing an appeal with his client. Defendant believes that he clearly voiced his desire to appeal, while counsel did not believe the issue had been decided. This could be a simple misunderstanding. However, counsel's own testimony shows that he did not ascertain or clarify his client's wishes. Mr. Sutherland's belief that Defendant did not want to file an appeal was admittedly based on his own assumptions, and even after leaving the February 5 meeting with the issue unresolved, counsel did not follow up to clarify Defendant's position. *See Flores-Ortega*, 528 U.S. at 478–79.

In its brief, the Government argues that "Defendant is not a particularly credible witness," citing his felony record and mental health history (ECF No. 67 at

10).   It also dismisses the probative value of the jail phone calls by stating that "[w]hile the calls show that Defendant believed he had an appeal underway, they do not necessarily show the correctness of that belief" (*id*.)   The Government further claims that Defendant may not have a great motive "to fabricate grounds for a now frivolous appeal," but may be pressing the point "for only the moral victory, and [may] have a corresponding incentive. . . to remember things in the light most favorable to his position" (*id*. at 10–11).   In light of the transcripts of the phone calls, any suggestion that Defendant has fabricated his belief that an appeal was pending is belied by the record.   As noted above, the more logical explanation is that there was a misunderstanding between the parties.

The Government next argues that counsel was a credible witness.   It notes that "there is little shame in admitting an honest mistake about filing an appeal, and surely none worth risking a career of professionalism and integrity" (ECF No. 67 at 11).   Clearly no attorney wants to be found constitutionally ineffective under any circumstance, but even the best attorneys can make mistakes—including mistakes that stem from an honest misunderstanding of their clients' intentions.   Moreover, as previously noted, the undersigned observed the testimony of both Defendant *and* counsel and found both to be credible witnesses, with only minor inconsistencies in

their testimony.    Therefore, the recommendations made herein are *not* based on a finding that counsel testified untruthfully.    To be sure, Mr. Sutherland's testimony that Defendant never asked him to file an appeal was unequivocal, and Mr. Sutherland's actions showed that he believed that Defendant never specifically asked or directed him to file an appeal.    However, Mr. Sutherland was never directly questioned about Defendant's statement during the February 5, 2017, jail meeting that he wanted to "take a shot."    The record also reflects a lack of effort to definitively ascertain his client's wishes.    While this could have been an oversight on counsel's part in light of his professional opinion about the risk of taking an appeal, whether to take the risk was Defendant's decision, and the omission is thus significant.

The Government next argues that Mr. Sutherland's testimony is consistent with and corroborated by the surrounding facts (ECF No. 67).    The Government overstates the record evidence.    Both witnesses testified that Mr. Sutherland discussed the pros and cons of filing an appeal with his client at the jail meeting on February 5, 2017.    Their testimony diverged with what they believed the outcome of the meeting to be.    Defendant believed that he clearly told counsel he wanted to "take a shot" with an appeal.    Counsel, on the other hand, made an unconfirmed

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

assumption based on his professional opinion that Defendant probably would not appeal.   Mr. Sutherland memorialized this assumption in a handwritten notation on the sentencing minutes, along with the fact that he provided Defendant with the minutes on that date.

The Government assails Defendant's failure to recall that he was provided with the minutes during the February 5, 2017, visit.   However, it seems irregular that counsel would provide the same minutes to Defendant ten days later via U.S. mail.   Counsel notes in the accompanying letter of February 15, 2017, "I have received a copy of the minutes of the proceedings which spelled out what happened at the Sentencing Hearing" (EH Gov. Exh., Tab 8 at 4).   The letter does not reference the fact that counsel had already provided the same document to Defendant ten days earlier.   As such, it is not completely out of the question that counsel's notation on the minutes was erroneous, and the date he provided them to Defendant should have read "2-15-2017" instead of "2-5-17."   In addition, Mr. Sutherland's February 15, 2017, cover letter made no mention of an appeal, whether to confirm counsel's belief that Defendant had decided what he wanted to do about the appeal, or to remind Defendant that he needed to advise counsel what he wanted to do in this regard.

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

The Government maintains that Mr. Sutherland "made a reasonable effort to learn what Defendant wanted to do and gave Defendant instructions on how to communicate his decision" (ECF No. 67 at 14).    It faults Defendant for not raising the issue of an appeal during the March 6, 2017, courtesy visit at the jail.    Defendant testified that he believed he did not need to bring up the matter again because the appeal was pending—a belief that is corroborated by multiple references to his pending appeal in the jail phone calls.    It was counsel who believed the matter remained unresolved after the February 5, 2017, meeting and who declined to ascertain his client's wishes when it would have been both prudent and easy to do so.    The fact that counsel characterized the March meeting as a "courtesy visit" suggests that in counsel's mind a definitive decision not to appeal had been made between February 5 and March 6, 2017, although the event triggering that supposition is not apparent from the record.

Finally, the Government notes that the Supreme Court decided *Beckles* on the same day as the last jail meeting, thus "slamming the door shut on Defendant's guidelines challenge."    *Beckles v. United States*, 137 S. Ct. 886 (Mar. 6, 2017). Neither the date of the *Beckles* decision, nor the fact that Defendant's putative

appellate claim might be foreclosed today directs a finding that counsel's actions were reasonable.

In sum, the court finds that counsel did not comply with the directive of *Flores-Ortega* and make a reasonable effort to discover his client's wishes. Therefore, Defendant is entitled to § 2255 relief, and the opportunity to take an out-of-time appeal, or at minimum discuss with counsel and decide how he wishes to proceed in light of the current state of the law.

<u>Proper Procedures</u>

The Eleventh Circuit has stated that the proper procedure when an out-of-time appeal is warranted as a remedy in a § 2255 proceeding is:    (1) the criminal judgment from which the out-of-time appeal is to be permitted should be vacated; (2) the same sentence should then be reimposed; (3) upon reimposition of that sentence, the defendant should be advised of all the rights associated with an appeal from any criminal sentence; and (4) the defendant should also be advised that the time for filing a notice of appeal from that re-imposed sentence is fourteen days, which is dictated by Federal Rule of Appellate Procedure 4(b)(1)(A)(i).    *United States v. Parrish*, 427 F.3d 1345, 1347 (11th Cir. 2005) (quoting *United States v.*

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

*Phillips*, 225 F.3d 1198, 1201 (11th Cir. 2000)); *United States v. Palacios*, 516 F. App'x 734 (11th Cir. 2013).

Based on the foregoing, it is respectfully **RECOMMENDED**:

1.    The Amended Motion to Vacate, Set Aside, or Correct Sentence (ECF No. 44) be **GRANTED**.

2.    Defendant's criminal judgment be vacated and the same sentence be reimposed.

3.    Counsel be appointed for the purpose of appeal, or at minimum, to consult with Defendant with respect to his desire to appeal.

And it is **ORDERED**:

The writ shall remain in effect until it is dissolved by the district court.[5]

At Pensacola, Florida, this 7th day of January 2019.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

---

[5] At the hearing the undersigned placed the onus on post-conviction counsel to advise when the writ should be dissolved (ECF No. 65 at 90).   Thus, Defendant remains in local custody at this time.

Case Nos.: 3:16cr6/MCR/EMT; 3:18cv241/MCR/EMT

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.